TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-04-00593-CV




Lamb County Electric Cooperative, Inc., Appellant


v.


Public Utility Commission of Texas, Appellee




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. GN302903, HONORABLE DARLENE BYRNE, JUDGE PRESIDING



O P I N I O N


 Lamb County Electric Cooperative (the "Cooperative") asserted to the Public
Utility Commission (the "Commission") that Southwestern Public Service Company
("Southwestern") had exceeded the scope of its certificates of convenience and necessity and
was improperly providing electricity to customers inside the Cooperative's service area. The
Commission referred the matter to the State Office of Administrative Hearings for a contested-case hearing before an administrative law judge. The judge concluded that the service
Southwestern was providing was consistent with its certificates. The Commission adopted the
judge's proposal in its final order. The Cooperative appealed the order of the Commission, and
the district court affirmed the Commission's order. The Cooperative appeals the district court's
judgment, and we will affirm the judgment of the district court.


BACKGROUND 

 This appeal has a complex and lengthy procedural history originating in the
1970s. To facilitate the discussion of the issues raised in this appeal, we will provide a brief
summary of the procedural history of this case and of various changes that occurred in the
energy market in the 1970s.

 Prior to 1975, utilities were allowed to choose the areas and customers that they
wanted to provide service to, which meant that more than one utility might be providing service
to the same general area. (1) However, the manner in which a utility's customers were selected was
significantly altered as a result of the passage of the Public Utility Regulatory Act and the
formation of the Commission in 1975. See Act of June 2, 1975, 64th Leg., R.S., ch. 721, 1975
Tex. Gen. Laws 2327, 2327-52 (current version at Tex. Util. Code Ann. §§ 11.001-64.158 (West
2007 & Supp. 2008). The Act created a new regulatory scheme for public utilities, under which
the Commission began licensing utilities to serve power to a particular area. See Lamb County
Elec. Coop. v. Public Util. Comm'n of Tex., No. 03-00-00113-CV, 2001 Tex. App. LEXIS 173,
at *2 (Tex. App.--Austin Jan. 11, 2001, no pet.) (not designated for publication). In other
words, generally speaking, a single utility was given the authority to provide all of the electricity
to customers located inside a specific geographical region. This region was called a service area.

 To become a designated provider, utilities were required to apply for and obtain a
certificate of convenience and necessity from the Commission. Id.; see also Tex. Util. Code
Ann. § 37.051 (West 2007) (requiring utility to obtain permit before directly or indirectly
providing service to public). (2) That meant that electricity providers that desired to continue
providing service to an area they had been serving had to apply to the Commission for a
certificate.

 To make approving the applications and establishing the service areas more
efficient, the Commission consolidated the cases so that applications for neighboring service
areas were considered in the same docket. Because a utility might request a service area that
was too large to consider in one docket, it was possible that a utility might be a party to more
than one docket. During the dockets, the boundaries for the neighboring service areas were
established, and the boundaries were often reflected in certification maps submitted by utilities. 
Once the service areas were established, utilities were prohibited from interfering with the
operations of another utility by providing service within that utility's service area. See Tex. Util.
Code Ann. § 37.156 (West 2007) (listing actions Commission may take if utility interferes with
operations of another utility).

 As discussed previously, prior to the passage of the Act, it was not uncommon for
more than one utility to provide service to the same general area. Because the Commission was
effectively dividing the State into distinct service areas, it was possible that the boundaries
established by the Commission might effectively prohibit a utility from continuing to provide
service to some of its previous customers if the Commission placed those customers inside
another utility's service area. This would effectively strand a utility's power lines within the
service area of another utility and deprive the stranded utility of any economic benefit from
having installed the power lines. 

 To ameliorate this potentially inequitable result, the legislature and the
Commission established several remedies. For example, the legislature enacted section 37.155
of the utilities code, which allowed utilities to enter into agreements specifying the areas and
customers to be served by each utility. Id. § 37.155 (West 2007); see also Public Utils. Bd. v.
Cent. Power & Light Co., 587 S.W.2d 782, 784 (Tex. Civ. App.--Corpus Christi 1979, writ
ref'd n.r.e.) (describing how after passage of Act, Commission required utilities to enter into
negotiations regarding their service areas under regulation). Further, section 37.155 provided
that those types of agreements are "valid and enforceable" and "shall be incorporated into the
appropriate areas of certification" as long as the Commission approves the agreements. Tex.
Util. Code Ann. § 37.155. In other words, rather than limiting their service areas to distinct
regions, the utilities were allowed to negotiate their own arrangements regarding the areas and
customers that each utility could serve. If the utilities were able to reach agreements and if the
Commission approved the agreements, the agreements established the service areas for the
utilities.

 The Commission also provided an additional remedy when it promulgated the 
corridor rule. See Commission Rule 052.02.05.056(b)(6)(B) (1976) (current version at 16 Tex.
Admin. Code § 25.101(e)(1)-(3) (2008)). The corridor rule specifically applied to situations in
which the boundaries created in the certification dockets stranded a utility's pre-existing
distribution line inside another utility's newly designated service area. Essentially, the rule
allowed a utility to 

continue providing limited service through the stranded line. Id. Under the rule, a utility was
given a certification for a 400-foot wide corridor (200 feet on either side of the line) within
which the stranded utility was allowed to provide service to customers inside another utility's
service area. Id. The authorization given under the rule essentially constituted a type of dual
certification allowing a particular service area to be served by more than one utility. The rule
automatically applied to all certification dockets unless the Commission provided otherwise. (3)

 Prior to the passage of the Act, it was common for investor-owned utilities to only
provide service to the more population-dense portions of a county, while electric cooperatives,
which 

were owned by the customers that they served, provided electricity to the areas of a county,
generally the rural regions, that were less economically appealing to the investor-owned utilities.

 The dichotomy in service slowly eroded over time, and investor-owned utilities 
began providing service to more rural regions. One type of rural area that began obtaining
service from investor-owned utilities was oil fields. This change resulted, in part, because oil
field operations began using electricity rather than relying on natural gas.

 Starting in the 1960s, Southwestern, which is an investor-owned utility, began
building electric distribution lines that could deliver electricity to oil fields. Shortly thereafter,
Southwestern began providing service to oil field operations in counties throughout Texas,
including counties that were also served by the Cooperative.

 To mitigate some of the expense of constructing all of the distribution lines and to
lessen the risk of investing in distribution lines for customers that might not want to use its
services in the future, Southwestern installed some of the wiring but also allowed the oil field
operators to build their own lines that could connect to Southwestern's grid. The point at which
Southwestern's customers attached to its grid was called a delivery point. After the electricity
passed the delivery point, it traveled along the oil field operator's lines to where the electricity
was needed.

 After Southwestern had installed some of these distribution lines, the Act was
passed. As required by the Act, Southwestern and the Cooperative applied for certificates to
continue providing service to their customers. At that time, both Southwestern and the
Cooperative were providing electricity to parts of many counties in Texas, including three
counties relevant to this appeal: Cochran, Hockley, and Lamb counties.


 All of the Cooperative's service areas were established in two dockets before the
Commission. See Tex. Pub. Util. Comm'n, Application of Bailey County Electric Coop et al.
Concerning Certification in Bailey et al., Docket No. ECH-6 (4) ("Docket 8") (June 29, 1976)
(Order); Tex. Pub. Util. Comm'n, Application of Bailey County Electric Coop et al. Concerning
the Counties of Cochran et al., Docket No. 42 ("Docket 42") (Oct. 8, 1976) (Order). Although
the Cooperative's service areas were determined in those two dockets, the dockets also
established service areas for other utilities, including Southwestern. Among other counties,
docket 8 addressed service areas for Lamb County, and docket 42 addressed service areas for
Cochran and Hockley Counties.

 At the conclusion of the dockets, Southwestern and the Cooperative obtained
certificates of convenience and necessity. See Lamb County Elec. Coop., 2001 Tex. App. LEXIS
173, at *2. The final order in docket 8 stated that prior to the issuance of the order, the
Cooperative, Southwestern, and other utilities "reached an agreement and entered a stipulation as
to the areas to be served by them" and that the certificates issued were in accordance with those
agreements. See Tex. Util. Code Ann. § 37.155. Prior to the certification proceeding,
Southwestern had been providing service to Amoco Production, Inc., through a delivery point
located within Southwestern's service area in Hale County. As described previously, the
customer had connected to the delivery point via lines it had constructed. The customer's lines
originated in Hale County but terminated in Lamb County. Consequently, Southwestern had
been providing electricity to structures located inside what is now the Cooperative's service area.


 As with docket 8, the final order in docket 42 established service areas for the
Cooperative, Southwestern, and other utilities. Prior to certification, Southwestern was
providing service to several customers that are now located within the Cooperative's service
area. Lamb County Elec. Coop., 2001 Tex. App. LEXIS 173, at *3. In fact, several of
Southwestern's previously installed distribution lines crossed the common border established
during docket 42. Id. 

 The final order also incorporated the report and recommendations of the hearing
examiner that originally considered the issues in the docket. See id. at *2-3. In the report, the
examiner stated that the utilities had entered into agreements regarding the ability of the utilities
to provide service to customers within the service area of other utilities. Further, the report
stated that as part of the agreements, the utilities agreed to waive any right to provide service to
customers through the corridor rule. Additionally, concerning the right to provide service in
another utility's service area, the report explained that "[t]he agreement[s] would allow the
parties to keep existing customers but would prohibit taking a new customer outside of
certificated areas" and were "restricted to service of existing customers."

 Although the Commission's final order incorporated the examiner's report, the
order specifically repeated a conclusion found in the examiner's report that helped define the
utilities' respective service areas. This conclusion ("conclusion 7") provides as follows: 




If any distribution lines of Southwestern . . . are located outside [its] service area
boundaries . . ., pursuant to agreement by the parties, (5) such utilities are granted a 

Certificate of Convenience and Necessity for the facility (6) itself only insofar as
such facility is utilized to serve customers presently being served. Such utilities
are not granted a Certificate of Convenience and Necessity for a 400-foot corridor
as provided by the Commission Rule.





See Tex. Util. Code Ann. § 37.155. No party appealed this determination by the Commission.

 Several years after the Commission issued its final orders in dockets 8 and 42, the
Cooperative learned that some of the customers in its service area that were obtaining power
from Southwestern had added additional power lines to their existing power-line networks in
order to provide power to new oil wells and equipment. (7) Lamb County Elec. Coop., 2001 Tex.
App. LEXIS 173, at *4. Because Southwestern was still delivering electricity to those customers
through delivery points, the addition of the new lines and new equipment meant that the
operators were obtaining more electricity from Southwestern than they had at the time the
Commission issued its orders in dockets 8 and 42 and that the electricity from Southwestern was
being sent to a larger area. (8) 

 After learning about the increase in service, the Cooperative filed a complaint
with the Commission and asked the Commission to issue a cease-and-desist order instructing
Southwestern to stop providing electricity to"consuming facilities" located inside the
Cooperative's service area. Id. at *4; Tex. Pub. Util. Comm'n, Petition of Lamb County Elec.
Coop., Inc., for Cease and Desist Orders Against Southwestern Pub. Serv. Co. within Hockley
and Cochran Counties, Docket No. 2991 ("Docket 2991") (Dec. 6, 1980) (Examiner's Report). 
The Commission addressed the merits of the contested case in docket 2991.

 At the end of docket 2991, the Commission concluded that Southwestern was
authorized to provide service, including service over the new lines, to those customers that it had
been providing service to when it obtained its certificate. Docket 2991 (Jan. 8, 1981) (Final
Order) (adopting recommendation and report of hearing examiner); Docket 2991 (Dec. 6, 1980)
(Examiner's report); see Lamb County Elec. Coop., 2001 Tex. App. LEXIS 173, at *5. 
Essentially, the Commission reasoned that the additional service was proper because it was in
the public interest to allow Southwestern to provide electricity to its customers that will be used
to power both new and old consuming facilities. In particular, the Commission determined that
customer-owned power lines are necessary for the development of oil fields and that "the public
interest dictated that [Southwestern] be allowed to continue service over [the] newly constructed
lines." Lamb County Elec. Coop., 2001 Tex. App. LEXIS 173, at *5. Consequently, the
Commission did not issue a cease-and-desist order.

 In 1995, the Cooperative filed another complaint with the Commission, which
also contended that Southwestern was supplying power in a manner that exceeded the scope of
its 

certificates and again asked the Commission to issue a cease-and-desist order. In its complaint,
the Cooperative asserted that Southwestern had expanded its service to new customers located
inside the Cooperative's service area and had impermissibly utilized customer-owned lines to
provide service to customers located inside the Cooperative's service area. Tex. Pub. Util.
Comm'n, Petition of Lamb County Elec. Coop., Inc., for a Cease and Desist Order against
Southwestern Pub. Serv. Co., Docket No. 14454 ("Docket 14454") (July 24, 1995) (Petition). 
Specifically, the Cooperative wanted the Commission to prevent Southwestern from providing
service to hundreds of consuming facilities located within the Cooperative's service area. The
Commission addressed the merits of the contested case in docket 14454.

 During docket 14454, several oil-field operators who were buying electricity from
Southwestern, including Texaco Exploration & Production, Inc. ("Texaco") and Apache
Corporation, intervened. When considering the merits of the claims raised, the Commission
stated that the order in docket 42 was "decidedly ambiguous" on the issue of whether
Southwestern was restricted to providing electricity to consuming facilities that it was providing
service to prior to certification or whether Southwestern may enlarge its service to new
consuming facilities provided that the new facilities belonged to its preexisting customers. (9) 
Lamb County Elec. Coop., 

2001 Tex. App. LEXIS 173, at *7; see, e.g., Docket 14454 (Apr. 1, 1996) (Order on Certified
Issues) (describing order in docket 42 as ambiguous).

 In response to a motion by Southwestern, the Commission summarily disposed of
the case in favor of Southwestern and denied the Cooperative's request for a cease-and-desist
order. See Docket 14454 (Jan. 21, 1999) (Order); see also 16 Tex. Admin. Code § 22.182 (2008)
(explaining circumstances in which summary disposition is appropriate). The Cooperative
appealed the Commission's determination, and the district court affirmed the Commission's
order. However, this Court reversed the Commission's order and concluded that, by dismissing
the case summarily, the Commission prevented the Cooperative from having an evidentiary
hearing regarding the meaning of the Commission's order in docket 42 and whether the order
allowed for the type of expansion that the Cooperative took issue with. Lamb County Elec.
Coop., 2001 Tex. App. LEXIS 173, at *15-16. In particular, this Court reasoned that because the
pre-existing agreement between Southwestern and the Cooperative was incorporated into the
Commission's docket 42 order and because the Commission stated that the meaning of its order
in docket 42 was ambiguous, the Commission should have allowed the Cooperative to present
evidence regarding the understanding of the parties. (10) Id. at *16.


 After this Court remanded the case to the Commission, the Commission assigned
the case a new docket number, docket 24229, and referred the case to the State Office of
Administrative Hearings for an evidentiary hearing. See Tex. Pub. Util. Comm'n, Remand of
Docket No. 14454 (Petition of Lamb County Elec. Coop., Inc. for a Cease and Desist Order
Against Southwestern Public Service Co.), Docket No. 24229 ("Docket 24229") (Sept. 28, 2001)
(Preliminary Order). During the proceeding, the administrative law judge sought to answer
whether Southwestern had violated the terms of its certificates issued in dockets 8 and 42.

 Southwestern, the Cooperative, Apache Corporation, and Texaco all participated
in the evidentiary hearing. After the hearing concluded, the administrative law judge issued a
proposal for decision. Docket 24229 (Mar. 6, 2003) (Proposal for Decision). When reaching his
determination, the administrative law judge considered evidence relevant to ascertaining the
meaning of the orders in the two dockets and the intent of the parties when they entered
agreements regarding services that may be provided. After reviewing the evidence, the judge
concluded that Southwestern had been authorized to continue providing service to its customers
that were located in the Cooperative's service area and also been authorized to provide service to
meet those customers' future needs. In other words, the judge reasoned that Southwestern's
certificates allowed it to 

provide "service to new oil field loads of existing customers from the service delivery points it
had at the time of the original certification." Further, the administrative law judge concluded
that the evidence indicated that the utilities intended for Southwestern to provide service to "new
consuming facilities" located inside Lamb, Cochran, and Hockley counties "over customer-owned lines from the points of service certificated to [Southwestern] in 1976." Finally, in light
of the preceding, the judge recommended denying the Cooperative's request for a cease-and-desist order. Specifically, the judge surmised that because Southwestern's certificate
"encompassed the service currently in dispute," "a cease and desist order [was] inappropriate."

 The Commission adopted the administrative law judge's proposal and also issued
its own findings and conclusions. Docket 24229 (May 23, 2003) (Order). Specifically, the
Commission found that in dockets 8 and 42, it was the intention of the parties that Southwestern
"would continue to provide service to its oil field customers . . . and the customers would
continue to use customer-owned lines to energize existing and future wells and related
petrochemical facilities within their leases and units, including the portions of the leases and
units that extended into [the Cooperative's] geographic service area." Id.; see Tex. Nat. Res.
Code Ann. § 101.011 (West 2001) (explaining that oil "unit" may be developed when people
with interests in oil or gas fields agree to pool their interests for purpose of recovering or
conserving oil and gas). Similarly, the Commission concluded that in dockets 8 and 42,
Southwestern was "granted a [certificate] to serve the existing and future needs of its oil
company customers via customer-owned lines in the portions of their oil field leases and units
that extended into geographic areas of neighboring utilities, including [the Cooperative]." 


 After the Commission issued its final order, the Cooperative sought judicial
review of the order. See Tex. Util. Code Ann. § 15.001 (West 2007) (stating that party to
proceeding before Commission is entitled to judicial review); Tex. Gov't Code Ann. § 2001.171
(West 2000) (explaining that after exhausting administrative remedies, party aggrieved by final
agency decision is entitled to judicial review of decision). Southwestern, Texaco, and Apache
Corporation intervened in support of the Commission's order. The district court affirmed the
Commission's order in its entirety, and the Cooperative filed this appeal.


STANDARD OF REVIEW

 Several of the Cooperative's issues concern the propriety of the Commission's
order, findings, and conclusions. When reviewing these types of determinations, we employ the
substantial-evidence standard to ascertain whether the Commission's actions are adequately
supported by the evidence presented. Tex. Util. Code Ann. § 15.001 (stating that judicial review
of agency action is under substantial-evidence standard); Tex. Gov't Code Ann. § 2001.174
(West 2000) (allowing court to reverse agency determination if it is not supported by substantial
evidence). Under this standard, we are prohibited from substituting our judgment for the
Commission's "as to the weight of the evidence on questions committed to agency discretion,"
Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n, 146 S.W.3d 742, 748 (Tex.
App.--Austin 2004, no pet.) (citing Tex. Gov't Code Ann. § 2001.174), because the
Commission "is the sole judge of the weight to be accorded the testimony of each witness," 
Central Power & Light v. Public Util. Comm'n, 36 S.W.3d 547, 561 (Tex. App.--Austin 2000,
pet. denied), and because the Commission "may accept or reject in whole or in part the
testimony of the various 

witnesses who testify," City of Corpus Christi v. Public Util. Comm'n, 188 S.W.3d 681, 695
(Tex. App.--Austin 2005, pet. denied). In making this determination, we are not asked to verify
whether "the agency reached the correct conclusion, but whether some reasonable basis exists in
the record for the agency's action." Id. In fact, the evidence may actually preponderate against
the Commission's finding and be upheld as long as there is enough evidence to suggest that the
Commission's "determination was within the bounds of reasonableness." Id. We will sustain
the agency's order if the evidence is such that reasonable minds could have reached the
conclusion that the agency must have reached in order to justify its action. Texas Health
Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 453 (Tex. 1984).


DISCUSSION

 As a preliminary matter, we note the unique procedural posture of this case and
note the issues that we are not confronted with today. In this case, we are not called upon to
determine, de novo, whether the utilities in this case actually entered into agreements regarding
service that may be provided by each utility. In dockets 8 and 42, the Commission explicitly
determined that the parties had entered into those types of agreements, and no party contested
those determinations. Further, we are not charged with the task of determining, on our own,
what the terms of the agreements were. Rather, we are primarily faced with the task of
determining whether the Commission's interpretation of the orders and certificates issued in
dockets 8 and 42, as found in the various findings and conclusions in docket 24229, is supported
by substantial evidence. (11) See Public 



































































































































































 Moreover, during that docket, Hunter testified that the phrase "customers
presently being served" found in the final order in docket 42 referred to the operators of
oil leases and units that had been obtaining their power from Southwestern and that had
been distributing the electricity obtained to consuming facilities located inside their
leases and units over power lines that the operators had installed. Additionally, Hunter
testified that the order was intended to authorize Southwestern to continue providing
18. It is well-established petroleum industry practice for oil companies to install their
own customer-owned electric distribution systems in the oil field units and leases that
they are developing.


19. It is well-established petroleum industry practice for oil companies to have their
customer-owned electric distribution systems energized and served by a single power
supplier at a primary delivery point.


. . . 


26. The records in Docket Nos. [8] and 42 reflect [Southwestern's] long standing and
continuing practice of serving oil field operators at a primary delivery point, from which
the operators connect their own lines to serve specific wells and related oil production
facilities. 


27. The continuation of [Southwestern's] long-standing manner of serving its customers
who were the operators of the oil field units and leases was uncontroverted and
acquiesced to by [the Cooperative] in the original certification proceedings. 





 These findings are supported by substantial evidence. During docket 24229, Sam
Hunter, a witness for Southwestern who participated in the negotiations between the parties in
dockets 8 and 42, testified that "oil field electric service has always been unique in that rather
than the utility's lines, the oil operators' lines go to the specific oil field producing facilities." 
(Emphasis added). Evidence was also introduced showing that Southwestern's experience with
providing electricity to oil fields was consistent with the pattern described above. Specifically,
Hunter stated that Southwestern began providing service to the counties in dispute in the 1940s
and that in the 1950s and 1960s, Southwestern engaged in the expensive undertaking of erecting
electric distribution lines to provide service to the areas in question. Further, Hunter testified
that because the undertaking was so expensive and because there was no assurance that the oil
market in Texas would continue being profitable or that the oil field customers would continue to
use and purchase electricity, Southwestern ran its power lines along the perimeter of the oil
fields and 

allowed the customers to attach to the lines. Evidence of this practice was also presented to the
Commission when Southwestern applied to amend its applications in dockets 8 and 42. In
particular, Southwestern presented testimony and evidence that the oil field operators it was
providing service to inside the Cooperative's service area built their own distribution lines
throughout their leases and that Southwestern delivered its electricity to "one point of service."

 Moreover, in attacking the evidentiary basis for these findings, the Cooperative
does not argue that it objected to the prospect of Southwestern continuing to provide service to
customers via preexisting delivery points and allowing those customers to transfer power over
their own distribution lines. Similarly, in making its claims on appeal, the Cooperative does not
deny that Southwestern had been providing service to oil field operators in this manner for some
time, nor does the Cooperative deny that after certification, some of these operators were
located within the Cooperative's service area. Finally, we also note that the Cooperative did not
begin disputing the propriety of Southwestern providing service to customers inside the
Cooperative's service area until years after the Commission had issued its final orders in
dockets 8 and 42.


Findings 22, 24, and 25

 In findings 22 and 25 and part of finding 24, the Commission found that in
dockets 8 and 42, Southwestern was given the authority to continue providing service to
customers that were located outside of its service area and that Southwestern and the
Cooperative entered into agreements in those dockets allowing Southwestern to continue
providing service to customers that were located inside the Cooperative's service area. 
Specifically, the Commission found, in relevant part, as follows:


22. In Docket No. [8], Southwestern was certificated to continue to serve oil field
loads in [the Cooperative's] service area through customer-owned lines.


. . . 


24. In Docket No. 42, the parties agreed [that Southwestern's certificate] would
include the right to continue to serve customers that it was presently serving
outside of its geographic service area boundary.


25. In meetings among the parties to Docket Nos. [8] and 42 there was general
agreement between [Southwestern] and the negotiating representative for the
cooperatives, including [the Cooperative], that [Southwestern] would continue to
provide oil field service from primary delivery points via oil field operator
customer-owned lines including the portions of the operating units or leases that
extended into a neighboring utilit[y']s service area.





 These findings are consistent with the terms of the orders issued in dockets 8 and
42 and with testimony that was presented to the Commission.


Docket 8

 Prior to certification, Southwestern had been delivering electricity to Amoco
through a delivery point in Hale County, and Amoco had built lines that carried the electricity to
consuming facilities located in Lamb County. During docket 8, Hunter testified that
Southwestern was providing service to areas outside of its boundaries found on the certification
maps and that by filing its application Southwestern was specifically seeking authority to
continue providing service to customers that it was serving immediately prior to certification. 
After hearing testimony and considering the evidence presented, the Commission issued its order
in docket 8 stating that Southwestern and the Cooperative had entered into an agreement
regarding the service that they could provide. That agreement was incorporated into the final
order in docket 8 and, therefore, its 

accompanying certificate. Specifically, the order stated that the parties to the docket were
entitled to certificates for "areas which they have agreed" to serve.

 Additionally, during docket 2991, Delbert Smith, the general manager of the
Cooperative, testified regarding the agreement between the parties in docket 8 and stated that
the agreement allowed for Southwestern to continue providing electricity to its oil field
customers and that the Cooperative did not have any objection to Southwestern continuing to
provide service to its prior customers and allowing the customers to distribute the electricity to
consuming facilities located inside the Cooperative's service area. In particular, Smith testified
as follows:




Q: So then you are not objecting to the service by Southwestern to Amoco at the
primary metering point in Hale County if Amoco takes that power through its
customer-owned lines and uses it for the load that existed as of the certification
date?


A: Okay. Serving any load that existed prior to certification.


Q: You have no objection to that?


A: We have no objection to that. (12)


Q: So, and then likewise with Texaco, you have no objection to the service, the
delivery of power by Southwestern to Texaco for Texaco's use at Well 1 and 2?


A: No, that's what the agreement was. We have no problem with that. (13)

 Smith's testimony was also echoed by another of the Cooperative's witnesses,
Donald Stubbs, who was a field engineer for the Cooperative. In docket 24229, Stubbs stated
that the utilities in docket 8 made arrangements allowing consuming facilities to continue
receiving service from the utility that it was obtaining service from at the time of certification. 
Furthermore, in docket 24229, Hunter testified that the Commission granted certificates that
allowed utilities to continue providing service to preexisting customers when it issued its order
in docket 8. This statement is also consistent with the testimony of David Hudson, another of
Southwestern's witnesses, who testified that the parties to docket 8 agreed to allow Southwestern
to continue serving its preexisting customers whose leases or units were now, at least, partially
located inside the boundaries of another utility's service area.

 Finally, in docket 24229, when describing testimony that he had provided in
docket 8, Hunter commented that there was no "indication of any dispute concerning
[Southwestern's] continuation of electric service to oil field customers at existing points of
delivery who use customer-owned lines" and then transfer the power to various parts of their oil
field leases or units. Similarly, in the proposal for decision in docket 24229, the administrative
law judge noted that in docket 8 "there was no indication of any dispute concerning
[Southwestern's] continuation of electric service to oil field customers at existing points of
delivery who use customer-owned lines to serve the portions of their leases or units that extend
outside [Southwestern's] geographic service areas." Docket 24229 (Mar. 6, 2003) (Proposal
for Decision).






Docket 42

 In Southwestern's application in docket 42, it sought permission to continue
providing service to "existing customers presently served." Similarly, during docket 42, Hunter
testified that Southwestern was seeking permission to continue serving the customers that it had
provided power to for years. Furthermore, in docket 42, when cross-examining one of
Southwestern's witnesses, the Cooperative acknowledged that after certification, Southwestern
would be providing service to customers inside the Cooperative's service areas that use their
own distribution lines.

 After considering the evidence and testimony presented, the Commission issued
an order in docket 42 stating that the parties had entered into agreements regarding the service
that each may provide and that Southwestern was specifically given a certificate to continue
providing service to its "customers presently being served" that are now located within the
Cooperative's service area. Docket 42 (Oct. 8, 1976) (Order).

 Furthermore, during docket 24229, Southwestern asked the Cooperative to
produce a copy of the original application that it filed in docket 42. Although the Cooperative
was unable to produce a copy of the application that it originally signed, the Cooperative did
produce an unsigned copy, which acknowledged the right of other utilities, including
Southwestern, to continue providing service to "premises" that they had been serving prior to
certification and defined "premises" as including the delivery points that utilities use to provide
service to oil field operators. Specifically, the application defined premises as follows:




when an electric utility furnished service to a person at one point from which such
person distributes electric service over its lines to oil, gas, or water well
installations, 'premises' shall be the pole or facility at which point title to the
electricity passes to such other person, regardless of the point or points at which
such service is metered. 






service to those oil leases and units and that there was "not a single voice in opposition to the
continuation of [Southwestern's] electric service to the oil field operators at existing primary
delivery points." (14) Also, Hunter stated that "there was a general agreement" between
Southwestern and all of the cooperatives to the various proceedings, including the Cooperative,
"that [Southwestern] would continue to provide" service to oil fields "from primary delivery
points via the oil field operator customer-owned lines" "in the same manner that it had been
doing for a long time." Additionally, Hunter testified that during the meetings with the various
cooperatives involved, Southwestern explained that if the cooperatives did not agree to allow
Southwestern to provide service to its oil-field customers, Southwestern would not agree to limit
its certification and instead would seek a certificate to provide service to the entire area.


 The findings are also consistent with the testimony of Hudson and Smith in docket
24229. Although he disputed the scope of the agreement, Smith acknowledged in docket 24229
that the parties entered into an agreement in docket 42. Further, Hudson testified that during
docket 42, Southwestern was under the assumption that it would be allowed to continue to serve
oil field operations inside the Cooperative's service area provided that Southwestern was
providing service to the same leases and units that it was serving prior to certification. 
Moreover, Hudson stated that the parties to docket 8 agreed to allow Southwestern to continue
serving its preexisting customers even if they were located inside the boundaries of another
utility's service area.


Findings 24, 28, and 30 and Conclusion 6

 In the remaining portion of finding 24, the Commission determined that the
utilities had waived their right to rely upon the corridor rule and found that there would have
been no reason for the utilities to agree to waive that right unless they had been given the power
in a collateral agreement to serve the growing needs of its customers that were located inside
another utility's service area. In particular, the Commission found, in relevant part, as follows:




24. In Docket No. 42, the parties agreed to waive the Commission's corridor rule. . . . 
There is no apparent reason [Southwestern] would have agreed to forgo its corridor
rights unless it could continue to serve the growing needs of its oil field customers that it
was presently serving outside of its geographic service area boundary. There is no
apparent reason [Southwestern] would have agreed to forgo its corridor rights unless it
could continue to serve the growing needs of its oil field customers from its existing
points of delivery.





 In finding 28, the Commission repeated its determination that the parties intended
that Southwestern be allowed to provide service to oil field operators, including those inside the
Cooperative's service area, through delivery points; however, the finding also included an
additional 

determination stating that the parties intended that Southwestern be given the ability to provide
service to cover the needs of future wells and other consuming facilities inside the operator's
leases or units. Specifically, the Commission found as follows:




28. In docket Nos. [8] and 42, the parties intended that [Southwestern] would
continue to provide service to its oil field operators at a primary delivery point
and the customers would continue to use customer-owned lines to energize
existing and future wells and related petrochemical facilities within their leases
and units, including the portions of the leases and units that extended into [the
Cooperative's] geographic service area. (15)





 Finally, in findings 30 and in conclusion 6, the Commission determined that the
parties to dockets 8 and 42 intended that Southwestern would be allowed to provide service to
cover the operators' future (16) electricity needs, including the ability to provide electricity to new consuming 

facilities located inside the operators' oil field leases or units. Specifically, the Commission
found and concluded as follows:



30. In Docket Nos. [8] and 42, [Southwestern] was granted a CCN to continue to
serve the portions of the oil field leases and units operated by [Southwestern's]
oil company customers that extended into [the Cooperative's] geographic service
area, including the future needs of the oil company customers coincident with
normal oil field development.


. . . 


6. In Docket Nos. [8] and 42, [Southwestern] was granted a [certificate of
convenience and necessity] to serve the existing and future needs of its oil
company customers via customer-owned lines in the portions of their oil field
leases and units (17) that extended into geographic service areas of neighboring
utilities, including [the Cooperative].







(Emphases added).

 These findings are supported by substantial evidence. The order in docket 42
specifically stated that Southwestern was "not granted a Certificate of Convenience and
Necessity for a 400-foot corridor." Similarly, in docket 42, Newton, the general manager for
South Plains, testified that all of the parties to docket 42 agreed to waive the corridor rule
because the parties created their own agreements regarding the service that the utilities could
provide. Smith echoed that testimony by stating, during docket 42, that the parties had entered
into their own agreements that replaced the corridor rule.

 In docket 24229, when testifying regarding the corridor rule, Hunter stated that
the parties agreed to waive the corridor rule that would otherwise have authorized a utility to
continue using a power line that had become stranded inside another utility's service area. In
other words, Southwestern agreed to give up the ability to serve customers located inside the
corridor and to serve new customers that move into the corridor. Moreover, Hunter testified
that from a financial standpoint and in light of the expense of installing distribution lines, it
would make no sense for Southwestern to waive the corridor rule and forgo expanding its
service within that corridor unless Southwestern had otherwise retained the right to continue
providing service through the power lines. Further, Hunter testified that although Southwestern
"agreed to waive corridor rights," it did so with the intention of continuing "to provide service
to the oil field operators at the single primary delivery points on those distribution lines."

 Moreover, in docket 42, Hunter testified that Southwestern was seeking
permission to continue to serve the customers to which it had historically provided service and
to serve the customers' future needs. That testimony is supported by the statement prepared by
Newton in docket 42 that, in part, explained the service agreement between Southwestern and
South Plains. In the statement, Newton requested that Southwestern be given a certificate to
serve "additional oil field type loads (petrochemical) as can be served without extension of its
facilities from its location 

as it presently exists." In docket 24229, Hunter also explained that during the earlier dockets
there was no "opposition to the oil operators' use of the [Southwestern] supplied electric service
to fulfill the operators changing needs coincident with normal oil field production."

 Hudson provided similar testimony during docket 24229. He stated that in
dockets 8 and 42, Southwestern was given the authority to provide service to future consuming
facilities added in the normal course of development to the leases and units of Southwestern's
customers located inside the Cooperative's service area. Moreover, Hunter testified that the
consuming facilities in dispute were added in the normal course of development. Furthermore,
he stated that although Southwestern's service would be limited to the distribution lines and
points of delivery it had previously installed, the agreement between the utilities allowed
customers to continue their practice of using and installing their own distribution lines to meet
their current and future needs. Davis's testimony in docket 24229 also supports the
determination that Southwestern was given the authority to serve its customers' future needs. As
mentioned previously, Davis testified that it was common for oil operators to add new
consuming facilities when they developed an oil field. Further, he stated that after Southwestern
began installing distribution points, Texaco "made development plans based on the assumption
that it would use electric power distributed over customer owned lines" when it continued to
develop its properties. (18) Moreover, Davis stated that the normal development of an oil lease
involved making significant changes to the lease, including creating new wells, and that Texaco
believed that it would be allowed to obtain all of its power needs from Southwestern. Finally,
Davis testified that Texaco did not generally develop properties with split-distribution systems
and that requiring Texaco to split where it obtained its electricity from at the time of
certification would not have benefitted Texaco financially and would have been inconsistent with
oil industry practice at that time.

 For these reasons, we conclude that all of the disputed findings and conclusion
are supported by substantial evidence and, accordingly, overrule the Cooperative's second issue
on appeal. (19)

Conclusion 6 is Consistent with Relevant Law

 In its second issue, the Cooperative asserted that conclusion 6, in addition to
other Commission determinations, was not supported by substantial evidence. In its first issue,
the Cooperative also disputes the propriety of conclusion 6.

 First, the Cooperative contends that the authority granted under conclusion 6
went beyond the certifications that the Cooperative received in dockets 8 and 42. As support for
this assertion, the Cooperative refers to the certification maps utilized in the two dockets that
show the service areas of various utilities, including the Cooperative and Southwestern, at the
time the utilities originally obtained their certificates. The Cooperative notes that the maps do
not make any explicit reference to the ability of Southwestern to serve the existing or future
needs of the customers located inside the Cooperative's service area.

 Previously, we concluded that the various findings that form the basis for
conclusion 6 as well as conclusion 6 itself are supported by substantial evidence. In light of that
determination, we cannot conclude that conclusion 6 exceeds the limits of the certifications
granted in dockets 8 and 42.

 Second, the Cooperative complains that by allowing Southwestern to serve the
"future needs" of the customers at issue, the Commission has violated the dictates of the utilities
code. Specifically, the Cooperative asserts that the utilities code requires certification for a
particular area, not for particular customers. As support for this proposition, the Cooperative
cites to subsection 37.051(b) of the utilities code, which provides as follows:




Except as otherwise provided by this chapter, a retail electric utility may not
furnish or make available retail electric utility service to an area in which retail
electric utility service is being lawfully furnished by another retail electric utility
unless the utility first obtains a certificate that includes the area in which the
consuming facility is located.





Tex. Util. Code Ann. § 37.051(b) (emphasis added). Further, the Cooperative argues that
because the Commission's interpretation of the certificates issued in dockets 8 and 42 provides
no express limitation on the future needs that Southwestern can serve or on the locations to
which service may be provided, the Commission effectively issued an "open-ended" certificate
authorizing Southwestern to provide service in the Cooperative's service area that were
constrained solely by the needs and desires of Southwestern's customers. Stated differently, the
Cooperative asserts that the Commission's conclusion would allow Southwestern to further
invade the Cooperative's service area and reach into areas not expressly "specified within
[Southwestern's] certification boundaries." (20)

 In further support of its assertion that the Commission's actions contravene the
dictates of subsection 37.051(b), the Cooperative refers to Citizens Coop Gin v. General Tel.
Co., 728 S.W.2d 903 (Tex. App.--Austin 1987, no writ), which involved a predecessor to
subsection 37.051(b). In that case, Citizens Coop Gin (the "Gin") attempted to obtain new
telephone service from South Plains Telephone Cooperative ("Telephone Coop") rather than
obtain the service from its existing carrier, General Telephone Company ("General
Telephone"). Id. at 904. To obtain the service, the Gin installed telephone distribution lines in
Telephone Coop's service area that would connect the Gin to the Coop's distribution network. 
Id. After learning about this, General Telephone asked the Commission to issue a cease-and-desist order on the ground that Telephone Coop "was providing service beyond its certificated
area." Id. at 905. The Commission denied the request. Id. On appeal, this Court concluded
that the Commission erred by allowing Telephone Coop to provide service to the Gin because
the statute in effect at that time, like subsection 37.051(b), required that a utility seeking to
provide service to an area that has been certificated to another utility must first obtain its own
certificate stating "the area in which the consuming facility is located." Id. at 906 (emphasis
added).

 In light of this last statement, the Cooperative argues that this Court has
mandated that if a utility seeks to provide service in another utility's service area, the utility
must first obtain a certificate that specifically describes the geographic locations of the
customers that the utility is seeking to serve. Further, the Cooperative contends that because the
Commission never issued a certificate providing that type of geographic specificity, conclusion 6
is inconsistent with the reasoning of the Citizens Coop Gin case.

 For several reasons, the Cooperative's reliance on subsection 37.051(b) is
misplaced. First, subsection 37.051(b) applies to circumstances that are not present in this case. 
Subsection 37.051(b) applies, by its terms, to situations in which a utility is attempting to
provide service to an area that it has not been given a certificate to serve and that has already
been certificated to another utility. Tex. Util. Code Ann. § 37.051(b). However, those
circumstances are not present here. In the present case, prior to the passage of the Act,
Southwestern had been providing service to customers located inside what is now the
Cooperative's service area. Moreover, the Commission found that prior to certification and in
accordance with the utilities code, Southwestern and the Cooperative entered into agreements
regarding the service each could provide. See id. § 37.155. (21) The Commission approved those
agreements, and they were incorporated into the certificates issued in dockets 8 and 42. In other
words, Southwestern was given certificates to provide service to customers in accordance with
the terms of the agreements that Southwestern and the Cooperative entered into. Further,
substantial evidence supports the Commission's interpretation of the agreements and certificates
as allowing Southwestern to serve the current and future needs of its preexisting customers now
located inside the Cooperative's service area.

 Morever, even assuming that subsection 37.051(b) were applicable to the current
circumstances, the provision also specifically allows for exceptions to its requirements if they
are authorized by anther provision of the utilities code. Id. § 37.051(b) (explaining that
provision applies "[e]xcept as otherwise provided by this chapter"). One such exception is
found in section 37.155, which, as discussed previously, allows utilities to enter into agreements
regarding the service that they will provide. Id. § 37.155.

 In light of the preceding, we also conclude that the Cooperative's reliance on the
Citizens Coop Gin case is misplaced. In that case, unlike the current case, Telephone Coop was
not given a certificate authorizing it to provide service to customers in another utility's service
area. Moreover, when stating that a utility was required to obtain a certificate detailing the
location of a proposed consuming facility before providing service to the facility, this Court did
not, as alleged by the Cooperative, impose any additional geographic requirement for
certification and was merely repeating the mandates of the predecessor to subsection 37.051.

 We also disagree with the Cooperative's assertion that the Commission
authorized Southwestern to provide essentially unlimited service in the Cooperative's service
area. In issuing the various certificates, the Commission complied with the provision of the
utilities code allowing utilities to enter into agreements regarding their service areas. Further,
although the final orders in dockets 8 and 42 do not themselves provide the specific limitations
on the service that Southwestern could provide inside the Cooperative's service area, the
Commission found in docket 24229 that the parties' intention when entering the agreements was
to allow Southwestern to provide service to its preexisting customers so that those customers
could energize consuming facilities located "within their leases and units." Docket 24229 (May
23, 2003) (Order). In other words, the Commission found that the agreements were limited by
the customers that could be served and by the specific geographic regions that could be served: 
service was limited to customers in existence prior to certification and to those customers' leases
and units, which had been established by the time of certification. (22) Moreover, the Commission
also found that the agreements allowed Southwestern to provide service through delivery points
that had been used to provide power to those customers in the past. Those delivery points were
also geographically fixed.

 For these reasons, we overrule the Cooperative's first issue on appeal.


The Commission's Order is Not Inconsistent with its Prior Precedent

 In its third issue, the Cooperative contends that the Commission's order is
inconsistent with prior Commission precedent. Specifically, the Cooperative argues that in the
past, the Commission has looked to certification maps to ascertain the scope of a certificate but
avers that in this case, the Commission improperly considered other evidence. Essentially, the
Cooperative asserts that the Commission should have limited its consideration to the
certification maps because they "are the primary evidence to determine certification
agreements." Further, the Cooperative argues that by considering additional information in this
case, the Commission has violated its prior precedent and failed to adequately explain its
decision to diverge from that precedent. See Flores v. Employees Ret. Sys., 74 S.W.3d 532, 539-40 (Tex. App.--Austin 2002, pet. denied) (explaining that agencies are "not bound to follow its
decisions . . . in the same way that a court is bound by precedent" but that courts frequently
require agency to explain inconsistent agency determinations or explain why agency departed
from its previous policy). Finally, the Cooperative insists that the certification maps in this case
unambiguously demonstrate that Southwestern was not granted a certificate to serve the "future
needs" of various oil field operators. For these reasons, the Cooperative argues that the
Commission's order is "arbitrary, capricious, and an illegal and unwarranted exercise of policy
discretion."

 In making these assertions, the Cooperative relies on an unrelated prior
Commission docket, docket 24815. See Tex. Pub. Util. Comm'n, Complaint of Fayette Elec.
Coop., Inc., Against the City of Schulenburg, Tex., Docket No. 24815 ("Docket 24815") (Nov.
15, 2002) (Final Order). In that docket, the Commission was asked to determine whether the
City of Schulenburg was encroaching on another utility's service area. To resolve the dispute,
the location of the boundary between the two utilities had to be considered, and the Commission
analyzed the relevant certification map to ascertain the boundary between the City of
Schulenburg and the other utility. (23) 

 For the reasons that follow, we disagree with the Cooperative's assertions and its
reliance on docket 24815. First, the type of information obtained from the map in docket 24815
is fundamentally different than the type of information at issue in this case. In docket 24815, the
Commission had to ascertain the location of the boundary between the City of Schulenburg and
another utility. In making this determination, the Commission reasoned that it was more
appropriate to use a map prepared during a prior certification proceeding than a handwritten
description. In the current case, however, the geographical boundaries between Southwestern
and the Cooperative are not in dispute (24); rather, the issue in this case is the extent to which
Southwestern was given the authority to provide service to customers inside the Cooperative's
service area. The fact that resolution of the issue in docket 24815 was accomplished by
examining the certification map would 

not seem to foreclose utilization of other evidence for non-boundary disputes, particularly in the
circumstances here in which the relevant certificates were issued decades prior to the current
dispute and in which the final orders in the earlier dockets approved and incorporated
agreements that the utilities had entered into but do not specify all of the details of the
agreements.

 Additionally, in docket 24815, the Commission concluded that its previous order
"unambiguously established the boundary by means of a map." (25) In this case, the Commission
made no conclusion stating that the certification maps "unambiguously" established the extent
to which the utilities in dockets 8 and 42 could provide service in another utility's service area. 
Further, when making its determination in docket 24815, the Commission did not ignore all
other additional information; in fact, the Commission considered the testimony from the
previous certification hearing when making its determination regarding the boundary. In its
findings, the Commission stated that the testimony demonstrated that the complaining utility
approved the map and the boundaries written on the map.

 Second, the Cooperative's argument ignores the procedural history of this case. 
In Lamb County Elec. Coop., the Cooperative appealed the Commission's order in docket 14454
that originally interpreted the extent to which Southwestern could provide increased service to
the customers located inside the Cooperative's service area. 2001 Tex. App. LEXIS 173. The
Cooperative complained that it was denied the opportunity to introduce evidence regarding the
circumstances of the earlier certification proceedings and regarding the agreements reached by
the parties. In particular, the Cooperative wanted to introduce copies of the transcripts from the
certification proceedings and testimony from witnesses who helped formulate the agreements
referenced in the certification dockets. Id. at *10, *15. In light of the Cooperative's complaints,
this Court remanded the case with instructions that the Commission conduct an evidentiary
hearing, and an evidentiary hearing was held. Id. at *15. The Cooperative cannot now
maintain a claim that the Commission should not have considered the very evidence the
Cooperative fought so vigorously to introduce.

 For these reasons, including the fact that the maps did not contain all of the
agreements between the parties, we cannot conclude that the Commission's decision to consider
evidence beyond the maps and orders from dockets 8 and 42 was inconsistent with its prior
precedent.


Southwestern's Authorization Did Not Expire as a Matter of Law 

 In its fourth issue on appeal, the Cooperative argues that the Commission erred
when it issued its order because it failed to conclude that Southwestern's right to continue
providing service to customers located in another utility's service area expired as a matter of
law. (26) In making this assertion, the Cooperative contends that the right to continue providing
service was a limited and 

a conditional right that automatically expired when Southwestern violated the terms of the
agreement by providing service that exceeded the amount of service provided at the time of
certification and by providing service to new consuming facilities. As proof of the limited and
conditional nature of the right, the Cooperative refers to the portion of conclusion 7 from the
order in docket 42 that stated that Southwestern was given the right to continue providing
service to facilities "only insofar as such facility is utilized to serve customers presently being served."

 For the reasons that follow, we cannot agree with the Cooperative. First, as
previously discussed, Southwestern and the Cooperative entered into various agreements prior
to certification, and those agreements were incorporated into the parties' certificates of
convenience and necessity. In other words, Southwestern was specifically certificated to provide
electricity in accordance with the terms of those agreements.

 Second, we have previously determined that substantial evidence supports the
determination that the agreements allowed Southwestern to provide the service in dispute, i.e.,
service to meet the future needs of its customers located inside the Cooperative's territory.

 Third, even assuming that Southwestern had impermissibly exceeded the scope of
its certificate, we fail to see how that action would lead to an automatic expiration of the portion
of the certificate authorizing Southwestern to provide service to customers inside the
Cooperative's service area. The Commission made no specific determination stating that
Southwestern's certificate would expire automatically if Southwestern provided service in a
manner that exceeded the scope of its certificate. Moreover, the utilities code provides specific
prohibitions against the discontinuation of service. Specifically, it states that a utility must
"provide continuous and adequate service" to 



































































































































































































































































































































































































































1. As a preliminary matter, we note that some of the information presented in this background
section comes from undisputed portions of the parties' briefs. See Tex. R. App. P. 38.1(f)
(explaining that courts "will accept as true" facts stated in briefs unless facts are contradicted).
2. This appeal was not affected by the recent deregulation of the Texas utility market because
the legislature excluded, temporarily, this region and others from the transition to competition. See
Tex. Util. Code Ann. §§ 39.401-.463 (West 2007) (excluding certain utilities from the transition to
competition and providing that those utilities will continue to be "regulated under traditional cost
of service regulation"); id. § 41.052 (West 2007) (prohibiting utility not participating in customer
choice from charging unregulated prices); see also CenterPoint Energy Houston Elec., LLC v. Gulf
Coast Coalition of Cities, 252 S.W.3d 1, 7-12 (Tex. App.--Austin Apr. 17, 2008, pet. filed) (op. on
reh'g) (describing transition from regulated to deregulated market).
3. The original corridor rule provided as follows:


(b) Certificates for Existing Service Area


For purposes of granting Certificates of Convenience and Necessity for those facilities and areas
which a utility was providing service on September 1, 1975, or was actively engaged in the
construction, installation, extension, improvement of, or addition to, any facility actually used or to
be used in providing public utility service on September 1, 1975, unless found by the Commission
to be otherwise, the following rules shall prevail for certification purposes:


. . .


(6)(B) The facilities and service area boundary for the following types of utilities providing
distribution or collection service to any area, or actively engaged in the construction, installation,
extension, improvement of, or addition to such facilities or the utilities system as of September 1,
1975, shall be limited, unless otherwise found by the commission, to the facilities and the area which
lie within 200 feet of any point along a distribution line, which is specifically deemed to include
service drop lines, for electrical utilities. (Emphasis added).


Commission Rule 052.02.05.056(b)(6)(B) (1976); see 16 Tex. Admin. Code § 25.101(e)(1)-(3)
(2008); see also Public Utils. Bd. v. Cent. Power & Light Co., 587 S.W.2d 782, 785 (Tex. Civ.
App.--Corpus Christi 1979, writ ref'd n.r.e.) (discussing corridor rule).
4. Some time after the initiation of the docket, the docket number was changed from ECH-6
to 8.
5. The scope of the agreements entered into by the parties during the two dockets is an issue
in this case.
6. We note that in the record in this case and in the various statutes and rules governing this
case, the word "facility" is used in very different contexts. For example, the phrase "consuming
facility" is used to refer to an oil well or other similar structure that uses electricity. However, one
of the Cooperative's witnesses testified that the word "facility" in conclusion 7 refers to a stranded
distribution line.
7. In particular, Amoco Production Co. and Texaco, Inc., built new lines carrying power to
wells that were added to their oil fields after Southwestern obtained its certificates. Tex. Pub. Util.
Comm'n, Petition of Lamb County Elec. Coop., Inc., for Cease and Desist Orders Against
Southwestern Pub. Serv. Co. within Hockley and Cochran Counties, Docket No. 2991 (Dec. 6, 1980)
(Examiner's Report).
8. Although some of the customers that Southwestern was providing power to had added new
electric wires to their various interests, none of the customers' geographic interests had increased
in size. In other words, although the customers were supplying power to areas that did not have
service before, those areas were located within the preexisting geographical boundaries of the
customers' interests.
9. The Commission temporarily abated docket 14454 to allow Southwestern to apply for dual
certification to the disputed area. Docket 14454 (Apr. 1, 1996) (Order on Certified Issues); see Tex.
Pub. Util. Comm'n, Application of Southwestern Pub. Serv. Co. to Amend Certificated Service Area
to Provide for Dual Certification in Hockley and Cochran Counties, Texas, Docket No. 16738
("Docket 16738") (Dec. 9, 1996) (Order Separating Docket). Essentially, the Commission reasoned
that this would be the most practical way to resolve the dispute. Docket 14454 (Apr. 1, 1996)
(Order on Certified Issues). Ultimately, the Commission granted dual certification, Docket 16738
(Apr. 29, 1998) (Order), but for reasons not relevant to this appeal, Southwestern subsequently
moved to dismiss the dual-certification docket and withdrew its dual-certification application,
Docket 16738 (Feb. 16, 1999) (Order Granting Motion to Withdraw and Dismiss). Around the same
time, the Commission reinstated docket 14454. See Docket 14454 (Jan. 22, 1999) (Supplemental
Preliminary Order).
10. This Court also concluded that the case should be remanded for an additional reason. As
discussed previously, in docket 2991, the Commission concluded that Southwestern had the right
to continue providing service to certain customers located inside the Cooperative's service area. In
light of that order, this Court remanded the case to allow the Commission to consider evidence
regarding whether the Cooperative's claims in docket 14454 were barred by the doctrine of res
judicata due to the Commission's prior determination. Lamb County Elec. Coop. v. Public Util.
Comm'n of Tex., No. 03-00-00113-CV, 2001 Tex. App. LEXIS 173, at *24 (Tex. App.--Austin Jan.
11, 2001, no pet.) (not designated for publication); see Barr v. Resolution Trust Corp., 837 S.W.2d
627, 628 (Tex. 1992) (explaining that doctrine of res judicata prohibits relitigation of claims that
have already been fully adjudicated). On remand, the Commission ultimately concluded that the
doctrine did not apply to this case because the circumstances had changed from the time that the
Cooperative made its initial determinations in docket 2991. Docket 24229 (May 23, 2003) (Order). 
That determination has not been appealed. Consequently, we make no additional determination
regarding the doctrine in this appeal.
11. In making these statements, we are mindful that the administrative law judge postulated
in a footnote in his proposal that if he had to choose, he would conclude that "no enforceable
contract was reached between" Southwestern and the Cooperative. See Docket 24229 (Mar. 6,
2003) (Proposal for Decision). The findings by the Commission state its determination that the
parties did enter into agreements and that those agreements were approved by the Commission in
dockets 8 and 42. Id. (May 23, 2003) (Order).


 We are also mindful of the holding in Public Utils. Bd. v. Central Power & Light Co., 587
S.W.2d 782. In that case, the Commission held a hearing regarding the scope of an agreement
entered into between three utilities. Id. at 785. However, prior to resolution by the Commission,
two of the utilities sought a temporary injunction from a district court and presented the same
arguments made before the Commission. Id. The appellate court determined that the district court
had jurisdiction over the relief sought, which required the court to construe the agreement entered
into by the utilities and that had been approved by the Commission. Id. at 787-88.


 Although the appellate court in Public Utils. Bd. held that the district court had the authority
to construe, on its own, the terms of the agreement, the situation presented in that case differs
significantly from this case. In Public Utils. Bd., no findings of fact or conclusions of law had been
issued by the Commission prior to the district court's involvement, and the case concerned a
temporary injunction, not an appeal from a final administrative order.
12. We note that this testimony is inconsistent with the Commission's ultimate determination
that Southwestern's certificates allow it to increase the level of service that it provides to its
customers that are located inside the Cooperative's service area in order to meet its customers'
future needs. Although this testimony does not directly support that determination, for reasons that
will be more thoroughly explored later in the opinion, we conclude that the Commission's
determination regarding future needs is supported by other evidence.
13. Smith provided similar testimony in docket 16738, the dual-certification docket that was
eventually dismissed. In that docket, Smith stated that Southwestern had "the right to continue to
serve any well that was in--that was electrified" before the need for certification.
14. Hunter also testified that it was customary in the oil industry for the operator of a
particular oil field to change, and the Cooperative seemed to acknowledge the continuing nature
of the right to provide service to those areas when Smith stated during his testimony that ownership
changes would not impact Southwestern's authority to provide service to those areas.
15. In this issue, the Cooperative also urges that finding 29 is not supported by substantial
evidence. When this Court remanded docket 14454 to the Commission, this Court instructed that
in addition to remanding for consideration of the intent of the parties, the intention of the
Commission should also be considered in the analysis of the scope of the previous certificates. 
Lamb County Elec. Coop., 2001 Tex. App. LEXIS 173, at *18. In light of this instruction, the
Commission issued finding 29, which is nearly identical to finding 28, except that it substitutes "the
Commission" for "the parties" and states that it was the Commission's intention that Southwestern
be allowed to provide the service described in finding 28. Given that we ultimately conclude that
finding 28 is supported by substantial evidence and that the Commission specifically incorporated
the agreements between the Cooperative and Southwestern into its final orders, we also conclude
that finding 29 is supported by substantial evidence.
16. In challenging the determination that Southwestern was allowed to provide service to meet 
the future needs of its customers that were located inside the Cooperative's territory, the Cooperative
refers to a proposed amendment to the certification application filed by Southwestern and to a
hearing on the proposed amendment. The request was withdrawn before the issuance of the final
order in docket 42. In the proposed amendment, Southwestern stated that it delivered electricity to
oil field operators at one or more points and noted that in the past, oil field operators would ask
Southwestern to move the location of the delivery points if a different location was more efficient
and economical. Accordingly, Southwestern asked for the ability to modify the delivery points if
necessary.


 The Cooperative argues that this request demonstrates that there was no agreement allowing
Southwestern to expand the service that it provided to the areas in dispute. Essentially, the
Cooperative contends that it would be unnecessary to make this request if Southwestern already had
the ability to provide increased service to the region.


 In the proposal for decision in docket 24229, which was adopted by the Commission, the
administrative law judge determined that the application was focused on the "extension of service
from new service points" and that by filing the amendment, Southwestern was attempting to clarify
"that it could provide service to new consuming facilities from new delivery points--rather than
solely from existing delivery points." Docket 24229 (Mar. 6, 2003) (Proposal for Decision). In
other words, the judge concluded that the amendment was a request for an "additional right" that
was not expressly "included in the prior application" and not "an indication that the earlier
application did not include service to new facilities from existing delivery points."


 The interpretation of the proposed amendment as requesting an additional right distinct from
the ability to provide increased service to existing customers is supported by substantial evidence. 
The terms of Southwestern's original application sought the ability to continue providing service
to customers that would soon be located inside the service areas of other utilities. Further, the
application specifically stated that Southwestern would apply for permission to install "additional
'points of service'" when a customer requests an additional delivery point, but the application made
no mention of needing to apply for permission to provide electricity to its customers through
existing delivery points in amounts that exceeded the amount provided at the time of certification. 
In relation to the possibility of installing new delivery points, the proposed amendment asked for
"the right to service the oil and gas fields . . . whether such service is rendered through the existing
point of delivery or a different point of delivery requested by the operator of the oil and gas lease
in question." When interpreting the effect of the proposed amendment on the rights originally
requested in Southwestern's application, the hearings examiner in docket 42 concluded that the
amendment was a request to "include a claim for certification of future points of delivery to existing
petro-chemical customers, regardless of certified service areas." In other words, the examiner
surmised that by requesting the ability to install new delivery points, Southwestern was trying to
avoid the necessity of obtaining the Commission's permission before beginning installation. No
party disputed that determination. Finally, the interpretation is consistent with testimony given by
one of Southwestern's witnesses. Hunter testified that the purpose of the amendment "was to obtain
approval to provide the oil field operators additional points of delivery without the need to make
a new filing for a certificate." (Emphasis added).
17. In its reply brief, the Cooperative takes issue with the inclusion of the language "oil field
leases and units" in conclusion six and with the Commission's construction of dockets 8 and 42 as
granting Southwestern a certificate to continue providing service to "customers." In particular, the
Cooperative asserts that neither of the orders in dockets 8 or 42 granted the Cooperative the right
to provide service to leases or units and further contends that the final orders in the dockets,
particularly conclusion 7 from docket 42, certified "distribution lines," not customers, that
Southwestern was allowed to continue to use.


 However, we previously concluded that substantial evidence supports the Commission's
determination that Southwestern was certified to provide service to its customers in existence at the
time of certification, including the operators of oil field leases and units whose electricity needs
extended into portions of the Cooperative's service area. Moreover, in this subissue, we also
conclude that substantial evidence supports the Commission's determination that Southwestern was
given the authority to serve the future needs of those operators. In light of these determinations, we
cannot conclude that the Commission's construction of its prior orders or its inclusion of the phrase
"oil field leases and units" in its determinations was inadequately supported by the evidence
presented.
18. During docket 24229, the Cooperative did refer to and present evidence indicating that
Southwestern was not allowed to provide electricity to serve the needs of oil field operators that
were in excess of what Southwestern was providing at the time of certification. For example, Smith
testified that the certificates did not allow Southwestern to provide power to new consuming
facilities that were installed in the oil fields because those facilities were located within the
Cooperative's singly-certificated area. Similarly, Smith testified that the agreement between the
parties in docket 42 was "intended to be restricted to a stranded distribution line's use to provide
continued then-level of service to the consuming facilities controlled by then-specific customers,
then being served." Moreover, Stubbs testified that Southwestern's authorization to serve customers
within the Cooperative's service area would diminish over time. In particular, he stated that the
certifications allowing for service in another utility's territory were kept to a minimum and given
with the belief that most of the certifications would expire due to inactivity. Finally, Stubbs testified
that when the parties began establishing their service area boundaries, the parties did not consider
the future development of any oil field lease or unit; instead, he argued that the parties looked solely
to the distribution lines that were in place and the consuming facilities that were already in
existence. 

 Although this type of evidence does not support the Commission's determination, as detailed
previously, evidence in direct opposition to this testimony was also presented to the Commission. 
In resolving the conflicting testimony, the Commission was free to accept or reject the testimony
of the various witnesses when making a determination regarding what if any weight to give to the
testimony of the various witnesses. See City of Corpus Christi v. Public Util. Comm'n, 188 S.W.3d
681, 695 (Tex. App.--Austin 2005, pet. denied). Moreover, when resolving the conflicting evidence
in favor of Southwestern, the administrative law judge also stated that Hunter was the only witness
who testified during docket 24229 that actively participated in the negotiations between the parties
in dockets 8 and 42. Docket 24229 (Mar. 6, 2003) (Proposal for Decision).
19. In its second issue, the Cooperative also contends that finding 31 is not supported by substantial
evidence. Finding 31 states that "[w]ith one exception, [the Cooperative] has failed to establish that
[Southwestern] is providing service to any customer inconsistent with the terms of [Southwestern's]
CCN." All of the reasons given supporting the other disputed findings also compel us to conclude
that finding 31 is supported by substantial evidence. Moreover, we note that, regarding the one
exception, the finding also states that Southwestern "acknowledged th[e] error and has agreed to
discontinue service when [the Cooperative] informs it that [the Cooperative] is ready to provide
service to this customer. Accordingly, no relief is required to address the isolated issue here."
20. When making its various assertions, the Cooperative, on more than one occasion, refers
to a prior docket as support for the proposition that by providing electric service to a region outside
of its service area through customer-owned lines, Southwestern contravened prior Commission
precedent. See Tex. Pub. Util. Comm'n, Complaint of Nueces Elec. Coop., Docket No. 4572 (July
2, 1984) (Order). In that prior docket, the Commission concluded that "a public utility may not
provide service through customer-owned lines to a consuming facility located outside the public
utility's certificated area until the utility has received authority to serve the area." Id. In light of that
statement, the Cooperative insists that Southwestern's service to customers located inside the
Cooperative's service area is improper.



 The Cooperative's reliance on this prior docket is misplaced. In that docket, a utility sought
to provide service to an area that it had not received a certificate to serve and began distributing
electricity to that area before seeking permission from the Commission. In this case, Southwestern
was providing service to the customers in dispute prior to the need for certification and was given
certificates authorizing it to serve its preexisting customers. Moreover, the Commission determined,
based on substantial evidence, that the authorization encompassed the right to serve the future needs
of its preexisting customers. Cf. City of Coahoma v. Public Util. Comm'n, 626 S.W.2d 488, 490-92
(Tex. 1981) (concluding that City of Coahoma was entitled to continue providing service to
customers that it was serving prior to passage of Act but were now located in another utility's water
district).
21. We note that the terms of section 37.155 allows utilities to enter into agreements regarding
the areas that they will serve and regarding the customers that they will serve. Tex. Util. Code Ann.
37.155 (West 2007) (explaining that agreements may designate "areas and customers to be served
by the utilities").
22. It is worth noting that during docket 24229, Hunter testified that the certificates would not
authorize Southwestern to provide service to areas beyond "the geographic areas of the units or
leases that existed in the 1975-1976 time frame."
23. In its first issue, the Cooperative also raises arguments concerning the certification maps. 
In particular, when challenging the basis of the Commission's determination that Southwestern had
been given the authority to provide future service to its customers located inside the Cooperative's
territory, the Cooperative argues that the determination cannot be supported by substantial evidence
because the maps used during dockets 8 and 42 make no mention of allowing Southwestern to
provide service to those customers. Further, the Cooperative states that the "best" and "only"
evidence of the agreement between the utilities are the certification maps used in dockets 8 and 42
and the final orders in those dockets and further insists that none of those items support the
Commission's determinations. The Cooperative also notes that Southwestern played a significant
role in preparing the maps and, therefore, contends that the maps should be construed against
Southwestern.


 The Cooperative's argument disregards the other evidence presented, including the
determinations made in dockets 8 and 42 and the testimony and evidence presented in those dockets
as well as in docket 24229, that support the Commission's determinations. Moreover, the fact that
Southwestern prepared the maps would not seem to foreclose the possibility that the maps were not
meant to include all of the terms of the agreements between the parties. The Cooperative refers to
no case law or Commission policy requiring parties entering into agreements under section 37.155
of the utilities code to provide all the details of the agreement on a certification map. See Tex. Util.
Code Ann. § 37.155. Furthermore, a review of the maps reveals that not all of the terms of the
agreements were incorporated into the maps. Specifically, the maps make no mention of
Southwestern agreeing to waive the benefits of the corridor rule.
24. During docket 24229, the Cooperative's engineering services manager admitted that there
was no dispute regarding the boundary between the two utilities and stated that he believed that the
dispute was instead "about the intent of the line on the map" and about the scope of rights that were
given during the certification proceedings. Moreover, the maps were prepared with the involvement
of personnel from the Cooperative and from Southwestern, and the personnel from both utilities
verified that the boundary lines were drawn accurately.
25. It is worth noting that although the Commission made no specific ambiguity finding in
the final order in docket 24229, the Commission previously characterized the rights regarding the
ability to provide service to customers inside the Cooperative's service area previously granted to
Southwestern as ambiguous. See Lamb County Elec. Coop., 2001 Tex. App. LEXIS 173 at *16. 
26. In this issue, the Cooperative only addresses docket 42 and again states that Southwestern
was not given the authority to continue providing service to customers in Lamb County because
Southwestern had no stranded lines in Lamb County. However, we previously concluded that
substantial evidence supported the Commission's determination that Southwestern was given the
right to continue providing service to its current customers in both dockets.